*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee/Cross-Appellant,

UNPUBLISHED
February 21, 2023

v

No. 354975
Wayne Circuit Court
LC No. 18-009035-01-FC

RASHAUN DEVELL WILCOX,

        Defendant-Appellant/Cross-Appellee.

Before: CAVANAGH, P.J., and SERVITTO and GARRETT, JJ.

PER CURIAM.

Defendant was charged with two counts of assault with intent to commit murder, MCL 750.83, attempted armed robbery, MCL 750.92 & MCL 750.529, felon in possession of a firearm, MCL 750.224f, carrying a concealed weapon (CCW), MCL 750.227, two counts of felonious assault, MCL 750.82, and possession of a firearm during the commission of a felony, second offense, MCL 750.227b. Following a trial in April 2019, a jury found defendant guilty of the firearm charges and not guilty of attempted armed robbery and the felonious assault charges. However, the jury was unable to reach a verdict on the assault-with-intent-to-commit-murder charges, so the court declared a mistrial with respect to those charges. At a second trial in July 2019, defendant was found not guilty of the remaining charges. Thereafter, the trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to prison terms of 15 to 25 years for the felon-in-possession conviction and 7 to 20 years for the CCW conviction, to be served concurrently, but consecutive to a five-year prison term for the felony-firearm conviction. After defendant appealed his convictions on the weapons charges, he moved for a new trial on several grounds. The trial court granted defendant's motion for a new trial on the ground that the prosecutor presented false testimony at defendant's trial. Plaintiff has filed a cross-appeal challenging that decision. Because we conclude that the trial court did not abuse its discretion by granting defendant's motion for a new trial, we affirm that decision, rendering it unnecessary to consider defendant's claims of error.

# I. BACKGROUND

Defendant's convictions arise from a failed drug deal that led to a shooting in which two victims sustained nonfatal gunshot wounds.

Terry Watkins did some home improvement work for Rickey Jones. In January 2018, Watkins told Jones that he wanted to purchase a couple of pounds of marijuana and asked Jones if he knew anyone who sold marijuana. Jones contacted Lamar Tatum, an acquaintance, who in turn called his friend Rich, who then reached out to his contacts who could supply the marijuana. A meeting was arranged for January 30, 2018, at 3:00 p.m., to complete the transaction. Jones drove to Tatum's home on Kelly Street in Detroit, intending to introduce Tatum to Watkins, who was driving separately.

Within 15 minutes after Jones arrived at Tatum's house, two other men arrived. One of the men was Anthony Wilcox, defendant's brother, who was also known as Rizzo or Rich, and the other one was a man known as Tone. Jones, Tatum, Anthony, and Tone sat around the kitchen table waiting for Watkins, the buyer, and the men who were supplying the marijuana. Defendant arrived with the marijuana before Watkins arrived. When Watkins arrived, he waited in his car outside Jones's house, called Jones, and asked Jones to come to his car. Watkins wanted Jones to make the exchange. When Jones informed Watkins that he could not do that, Watkins drove away. After Watkins left, he called Jones and Tone grabbed the phone and spoke to Watkins. Jones listened to Tone as Tone tried to make Watkins feel comfortable enough to return and complete the purchase. After Watkins drove away, defendant opened his coat to show Jones that he had the two pounds of marijuana.

Watkins returned and Jones and defendant went outside to meet him. Although Watkins only wanted Jones to make the exchange, defendant would not hand the marijuana over to Jones. Defendant got into the front seat of Watkins SUV and Jones tried to get into the backseat, but the door handle was broken so he went back into the house. Jones heard Tatum say, " 'Oh, man, they robbed him.' " When Jones looked outside, he saw Watkins driving away and heard gunshots. Tone had run outside and started shooting in the direction of Watkins's SUV with a handgun. Everyone jumped in cars and chased after Watkins.

Tatum and Jones jumped into Jones's Chrysler 200 to chase after Watkins. Tatum had a gun and said that they were going to find him. While driving around, Tatum received a number of calls from defendant threatening Tatum and his family. After driving around for an hour, Jones realized that he might know where Watkins lived, so Tatum called defendant to let him know. As Jones started to head that way, he saw a black Dodge Journey pass him as it was traveling in the opposite direction. Tatum indicated that defendant and Anthony were in that car. As they passed each other, Jones saw defendant and Anthony in the back seat. Jones tried to drive away as fast as he could. He drove onto I-94, but the Dodge Journey caught up to him. When they caught up to him, Anthony pulled out an AK-47 and told Jones to pull over.

Jones pulled over onto the I-94 service lane because Anthony had a gun and Jones did not think that he could get away from the situation. Defendant walked up to the passenger side of Jones's car showed Jones and Tatum his revolver, which Jones described as chrome with a wooden

handle. Defendant threatened to kill Jones and asked for the keys to his car and his phone, but he refused to give defendant the items.

Jones calmed defendant down and defendant got back into the Dodge Journey. While they were driving, defendant exited his vehicle twice more to ensure that Jones continued to follow them. Tatum became frantic and tried to jump out of the car. As Jones approached the Harper and Berkshire intersection, the Dodge Journey pulled into oncoming traffic to pull up beside Jones. Defendant gestured for Jones to pull over. Jones tried to get away because he and Tatum were afraid that defendant was going to kill them. Jones made a U-turn, but his car hit the curb and stalled. Jones tried to start the car, but when Tatum jumped out of the car to run away, Jones decided to run away also.

While Jones was still driving, he had called 911 and stayed on the phone with the 911 operator until he dropped his phone when he ran from his car. As Jones ran, he saw Anthony get out of the Journey with an AK-47. Jones ran so fast that he fell. Both defendant and Anthony were shooting. Jones was shot and fell to the ground.

Jones was shot once in the rectum and underwent a number of surgeries and had to have a colostomy bag. Jones identified defendant in a photo lineup as the person who shot him. An innocent bystander was also injured when a bullet hit his car and metal particles punctured his leg.

After defendant's second trial, at which he was acquitted of two counts of assault with intent to commit murder, defendant filed a motion for a new trial. As relevant to this appeal, defendant sought a new trial on the ground that Tatum, a key prosecution witness who testified at trial pursuant to an immunity agreement, gave perjured testimony at defendant's first trial. In particular, before defendant's second trial, the prosecutor informed defendant and the trial court that she did not plan to call Tatum as a witness at the second trial because she determined that he had committed perjury at defendant's first trial. At the evidentiary hearing, the prosecutor explained that Tatum did not want to testify at defendant's trial because he was afraid of defendant's family. He was avoiding service on the subpoena, so the prosecution had him arrested to secure his appearance. The day before trial, Tatum expressed his intent to exercise his Fifth Amendment right against self-incrimination to avoid testifying. The prosecution then offered Tatum immunity in exchange for his truthful testimony. Tatum had previously testified in grand-jury proceedings and the prosecutor believed that his trial testimony would be inconsistent with his grand jury testimony. At trial, however, significant portions of his testimony were inconsistent with his prior grand jury testimony. The prosecutor impeached him with his inconsistent grand jury testimony, which was introduced as substantive evidence. The prosecutor believed that Tatum was honest in some of his responses, but dishonest in others. The prosecutor believed that Tatum committed perjury because his grand jury testimony corroborated Jones's testimony and the physical evidence, but his trial testimony was inconsistent with both. Tatum did not testify at defendant's second trial because the prosecutor believed that Tatum had lied at defendant's first trial and she did not think it would be beneficial to again call him as a witness.

Following the evidentiary hearing, the trial court granted defendant's motion for a new trial, finding that the introduction of Tatum's perjured testimony at defendant's trial violated defendant's right to due process. The court rejected defendant's other arguments in favor of a new

trial. The prosecution now appeals the trial court's decision granting a new trial and defendant appeals the trial court's rejection of defendant's other grounds for a new trial.

## II. PERJURED TESTIMONY

We will first address the prosecution's claim on cross-appeal that the trial court erred by granting defendant a new trial.

A prosecutor's use of false testimony is a violation of a defendant's due-process rights. *People v Brown*, 506 Mich 440, 446; 958 NW2d 60 (2020). Whether a defendant's right to due process was violated is a constitutional question that this Court reviews de novo. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). A trial court "may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice." MCR 6.431(B). This Court reviews a trial court's decision whether to grant a new trial for an abuse of discretion. *People v Jones*, 236 Mich App 396, 404; 600 NW2d 652 (1999). "A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable outcomes." *People v Rogers*, 335 Mich App 172, 191; 966 NW2d 181 (2020).

A prosecutor has an affirmative duty to correct false testimony when it arises. *Id*. The blameworthiness of the prosecutor is irrelevant. *Smith*, 498 Mich at 476. The crucial inquiry for due process purposes is the "effect of a prosecutor's failure to correct false testimony," and not every contradiction or every instance of mistaken or inaccurate testimony. *Id*. A new trial is required if the uncorrected false testimony could in any reasonable likelihood have affected the judgment of the jury. *Id*. (quotations marks and citations omitted). In *Smith*, 498 Mich at 477, the Court explained:

> Regardless of the lack of intent to lie on the part of the witness, *Giglio* [*v United States*, 405 US 150; 92 S Ct 763; 31 L Ed 2d 104 (1972),] and *Napue* [*v Illinois*, 360 US 264; 79 S Ct 1173; 3 L Ed 2d 1217 (1959),] require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness's responses on cross-examination. However, when it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury. *United States v Harris*, 498 F 2d 1164, 1169 (CA 3, 1974).

This case is different than many other cases in which a prosecutor presented perjured testimony. In *Smith*, the prosecutor did not correct a witness's testimony that he had not received any compensation for information central to the defendant's prosecution. *Smith*, 498 Mich at 478. The prosecutor was aware that an officer had given pretrial testimony that the witness had been compensated. *Id.* At trial, however, the prosecutor carefully limited her questioning of the witness and never sought to clarify that the witness had been compensated for his cooperation. *Id.* Moreover, the prosecutor capitalized on and exploited the witness's false testimony in her closing argument. *Id.* at 480.

This case involves the opposite scenario in which Tatum's testimony at trial was inconsistent with his earlier grand jury testimony in a way that was detrimental to the prosecutor's case and beneficial to defendant's case. Tatum testified that he did not remember the physical descriptions of the men who came to his home on January 30, or remember several other details of the day. He denied identifying anyone in a lineup and he denied that defendant was the "stocky guy" who he had previously testified held him and Jones at gunpoint, and threatened them. The prosecutor consistently corrected Tatum's testimony by impeaching him with his earlier grand jury testimony when he testified that he did not remember what had transpired or who was involved.

Before defendant's second trial, the prosecutor informed the trial court that she did not intend to call Tatum as a witness because she thought that Tatum had committed perjury during the first trial. At the evidentiary hearing, the prosecutor testified that she concluded that Tatum was committing perjury when Tatum repeatedly testified inconsistently with this grand jury testimony. When she realized he was committing perjury, she corrected his testimony with his prior grand jury testimony. Prosecutors have a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath. *People v Lester*, 232 Mich App 262, 276; 591 NW2d 267 (1998), overruled on other grounds by *People v Chenault*, 495 Mich 142; 845 NW2d 731 (2014). The prosecutor did not report her belief that Tatum was lying under oath to defendant or the trial court.

Although the false testimony in this case was detrimental to the prosecution, Tatum testified under a grant of immunity in exchange for truthful testimony. Without immunity, Tatum indicated that he would invoke his right against self-incrimination and refuse to testify. Because Tatum testified pursuant to an agreement that required his truthful testimony and the prosecutor failed to fulfill her constitutional obligation to report Tatum's perjury to defendant and the trial court when she determined that Tatum lied under oath, thereby disqualifying him from the grant of immunity, she violated defendant's right to due process. With Tatum on the witness stand, the prosecutor was able to introduce his prior grand jury testimony, which was more consistent with Jones's testimony. If Tatum had not been allowed to testify untruthfully, there would not have been any testimony to corroborate Jones's version of events. As such, defendant was denied his right to due process. Accordingly, the trial court did not abuse its discretion by granting defendant's motion for a new trial on this ground.

## III. CONCLUSION

The trial court did not abuse its discretion when it granted defendant's motion for a new trial on the ground that the prosecution failed to perform its constitutional obligation to report to defendant and the trial court that its witness lied under oath. Because defendant is entitled to a new trial on this ground, it is unnecessary to address the other claims of error raised by defendant in his appeal.

We affirm the trial court's order granting defendant a new trial and remand for further proceedings. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto
/s/ Kristina Robinson Garrett